**Opinion issued January 12, 2023**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-21-00369-CV

———————————

**CITY OF HOUSTON, TEXAS, Appellant**

**V.**

**THE COMMONS OF LAKE HOUSTON, LTD, Appellee**

---

**On Appeal from County Civil Court at Law No 4**
**Harris County, Texas**
**Trial Court Case No. 1161960**

---

## MEMORANDUM OPINION

In this inverse condemnation suit, appellant City of Houston, Texas (the City) appeals the trial court's order denying its plea to the jurisdiction seeking dismissal of appellee The Commons of Lake Houston, Ltd.'s (The Commons) takings claim brought under Article I, Section 17 of the Texas Constitution. In two

issues, the City contends that the trial court erred in denying its plea because The Commons' takings claim is barred by the City's governmental immunity and is not ripe for adjudication. We reverse the trial court's order and render judgment dismissing The Commons' claim for lack of jurisdiction.

## Background

### A.     The Crossing

The Commons is the developer of the Crossing at The Commons of Lake Houston, a roughly 300-acre master-planned community located on Lake Houston (The Crossing). Significant portions of The Crossing are located within the City's 100-year or 500-year floodplains.

In 2017, The Commons filed a general plan covering 122.5 acres of The Crossing and platted the first two sections. That same year, the City approved The Commons' plans for water, sanitary sewer, drainage facilities, and paving for a portion of The Crossing. The Commons also began site work on the first section of The Crossing, including water, sewage, and drainage lines. By April 2018, The Commons had invested millions of dollars in planning and infrastructure for The Crossing.

### B.     The 2018 Floodplain Ordinance

In the wake of Hurricane Harvey, the City passed Ordinance No. 2018-258 (the 2018 Floodplain Ordinance) to amend its existing floodplain development

ordinance codified in Chapter 19 of the City's Code of Ordinances. The amendments became effective on September 1, 2018.

Chapter 19, as amended, governs real property development in Houston's floodplains. *See* Hous., Tex., Code of Ordinances ch. 19, arts. I–V (2018), https://library.municode.com/tx/houston/codes/code_of_ordinances. Its stated purpose "is to promote the public health, safety and general welfare and to minimize public and private losses due to flood conditions in specific areas[.]" *Id*. art. I, § 19-1(a). Chapter 19 "provides a regulatory system to monitor the review of plats and permits to reduce the likelihood that development within this city will increase the dangers of flooding." *Id*. § 19-1(b). Section 19-1(c) states that "[t]he degree of regulation for flood protection established by this chapter is considered reasonable for regulatory purposes and is based on maps promulgated by FEMA that are required to be used as a condition of obtaining flood insurance." *Id*. 19-1(c).

The 2018 Floodplain Ordinance states that "the City desires to continue its participation in the Federal Insurance Rate Map (FIRM) program and to continue to meet the requirements of Title 44 Code of Federal Regulations, Sections 59 and 60 to allow its residents and businesses to secure insurance protection against flooding events at the most reasonable rates available[.]" Hous., Tex., Ordinance 2018-258 (Apr. 3, 2018) (hereinafter cited as Ord. No. 2018-258). It further states:

[T]he City Council finds that, to promote the public health, safety and general welfare of the City, and to meet federal requirements contained in 44 CFR Part 60, it is desirable to adopt this Ordinance to:

(1) Fulfill the City's obligation to regulate development in special flood hazard areas to ensure continued participation in FIRM;

(2) Protect investments made by citizens and business owners in real property with the City;

(3) Reduce flood losses and the loss of human life.

*Id.*[1]

Chapter 44, Part 60 of the Code of Federal Regulations, referenced in the 2018 Floodplain Ordinance, makes clear that the federal regulations establish only minimum standards for participation in the National Flood Insurance Program (NFIP). *See* 44 C.F.R. 60.1(d).[2] In recognition of these minimum standards, the 2018 Floodplain Ordinance states:

---

[1] Section 1 of the 2018 Floodplain Ordinance states that "the findings contained in the preamble of this Ordinance are determined to be true and correct and are hereby adopted as part of this Ordinance." Hous., Tex., Ordinance 2018-258 (Apr. 3, 2018).

[2] "The criteria set forth in this subpart are minimum standards for the adoption of flood plain management regulations by flood-prone, mudslide (i.e., mudflow)-prone and flood-related erosion-prone communities. Any community may exceed the minimum criteria under this part by adopting more comprehensive flood plain management regulations utilizing the standards such as contained in subpart C of this part. . . . Therefore, any flood plain management regulations adopted by a State or a community which are more restrictive than the criteria set forth in this part are encouraged and shall take precedence."

44 C.F.R. 60.1(d).

4

[I]n accordance with 44 CFR Part 60, FEMA encourages local communities to evaluate their regulations after a flood event, to adopt more stringent requirements based on local events, and to provide that local regulations for flood-prone areas should permit development in flood-prone areas only if:

(1) The development is appropriate considering the probability of flood damage and will reduce flood losses; and

(2) The development does not increase the danger to human life.

Ord. No. 2018-258. The 2018 Floodplain Ordinance further states that "in the exercise of its lawful authority, the City may enact police power ordinances to promote and protect the health, safety and welfare of the public[.]" *Id.*

As reflected in the amended ordinance, the City Council expressly found, in pertinent part:

- "[T]he Mayor charged Houston Public Works, and the Mayor's Recovery and Resilience Officers with studying the impact of these storms on the City's residents and business owners, and with making recommendations on reasonable, responsible rules for development throughout the City";

- "Houston Public Works has reviewed Chapter 19, Floodplains and implementing guidelines, has received technical assistance and input from professional stakeholder groups, has provided opportunity for public comment on these revisions, with over 3000 comments received, and after review and consideration, recommends the changes contained in this Ordinance";

- "[T]he City anticipates that FEMA will evaluate flood areas and issue new maps for the Houston area";

- "[B]ased on these preliminary estimations, the City Council finds that it is reasonable to expect that the new special flood hazard areas will include at least all the areas currently designated as the 100-year and 500-year flood zones on current FEMA maps"; and

- "[T]he City Council finds that the regulations proposed by Houston Public Works to require elevation of structures to two-feet above the 500-year elevation is therefore reasonable, will reduce flood losses, and reduce the danger to human life[.]

Ord. No. 2018-258.

Chapter 19 prohibits development in the floodplain without a development permit. *See* Code of Ordinances ch. 19, art. II, div. 1, § 19-11; *id.* div. 3, § 19-16(a). Subsections 19-17 and 19-18 set forth the requirements to obtain a floodplain development permit application. *See id.* div. 3, §§ 19-17, 19-18. Chapter 19 also sets forth detailed procedures for applicants to request variances from the ordinance's requirements:

(a) Any applicant for a permit may apply for a variance from the requirements of this chapter. Except as may be otherwise provided in subsection 19-22(f), a variance may be sought only on the basis that the imposition of the requirements of this chapter for the issuance of a permit to the applicant constitutes an exceptional hardship.

*Id.* § 19-20(a). "[A]n applicant may file a request for variance at any time." *Id.* § 19-20(b).

At the time The Commons began developing The Crossing, the City's then-existing floodplain ordinance required that new residential structures within the

6

100-year floodplain be built at least one foot above the flood elevation and did not include the 500-year floodplain. Among other changes, the 2018 Floodplain Ordinance, as codified in Chapter 19, required that new residential structures within the 500-year floodplain be built at least two feet above the flood elevation. *See id*. art. I, § 19-2; *id.* art. III, div. 2, § 19-33.

**C.     The Commons' First Lawsuit**

On April 27, 2018, The Commons sued the City asserting claims for inverse condemnation and declaratory judgment. *See City of Hous. v. Commons at Lake Hous., Ltd.*, 587 S.W.3d 494, 498 (Tex. App.—Houston [14th Dist.] 2019, no pet.). The Commons alleged that the application of the amended ordinance to its property would substantially damage the market value of the property and that the current development plan would be unfeasible. *See id.*

The City filed a plea to the jurisdiction contending that The Commons' claims were not ripe because the City had not had the opportunity to render a final decision applying its floodplain regulations to The Crossing. *See id.* at 498–99. The Commons responded and presented evidence which included the affidavit from an employee of an entity related to The Commons who testified that The Commons had "conducted an analysis" and determined that the development of The Crossing would be "financially unfeasible" under the amended ordinance and that nearly 70% of the lots would be "unsaleable." *Id.* at 499. The trial court denied the City's

7

plea. *Id.* The City appealed, contending that The Commons' claims were not ripe.[3] *Id.*

The Fourteenth Court of Appeals reversed the trial court's order denying the City's plea and rendered judgment dismissing The Commons' claims without prejudice. *See id.* at 503. In addressing The Commons' inverse condemnation claim, the court noted that it was undisputed that The Commons had not had any permit or plat applications, or request for variances, denied as a result of the amended ordinance. *See id.* at 501. It then considered The Commons' argument that the futility exception applied because it could not comply with particular requirements for the application for a floodplain development permit because it was a developer and not a builder. *See id.* at 501–02. Specifically, The Commons argued that the application required it to show the "proposed structures . . . drawn to scale," and that, given the nature of its business, any application for a permit would be purely hypothetical. *Id.* at 502.

The court rejected The Commons' argument, noting that "[n]othing prevents The Commons from seeking—and the City from granting—a variance notwithstanding The Commons' failure to show on the application residential buildings drawn to scale. *Id.* It stated that "The Commons would not need to

---

[3]    The amended ordinance became effective during the pendency of the appeal.

8

submit detailed plans for structures, i.e., residential buildings, if The Commons does not intend to build them." *Id*. It then stated:

> The purpose of the "final decision" requirement, usually evidenced through the denial of a permit, is to determine the "application of the regulations to the property at issue." The Commons' application must be sufficient for the City to make the determination of whether the regulations will bar residential construction below two feet above the 500-year flood elevation. The Commons need only follow "reasonable and necessary" steps to allow the City to exercise its discretion. If the City were to unreasonably withhold a final decision from The Commons regarding minimum elevation, the claim could ripen because subsequent applications or variance requests might be futile.

*Id.* (citations omitted). The court determined that the futility exception did not apply. *Id.* It held that The Commons was required to give the City an opportunity to exercise its discretion and, because it had not yet done so, its inverse condemnation claim was not ripe. *Id.*

**D.      The Commons Attempts to Appy for a Floodplain Development Permit**

Following the Fourteenth Court's ruling, the Commons submitted the following documentation to secure a floodplain development permit for The Crossing:

- On November 14, 2019, The Commons engineer, Adam Rinehart, emailed a "free-form application" to two employees responsible for permit intake at Houston Public Works on November 14, 2019. The application consisted of two one-page engineering maps of The Crossing with proposed floor elevations for each lot.

- On February 28, 2020, Rinehart submitted an unsigned, one-page "Flood Development Permit Application," "seeking a blanket finished floor

elevation 1' above FEMA current BFE [base flood elevation] for all current and future construction."

- On March 19, 2020, The Commons' engineer, Stephen Sheldon, amended the second application, unchecking the "new construction" box and resubmitting the exhibits attached to the original free-form application.

In response to each submission, The City informed The Commons that its application was incomplete and could not be processed.

In August 2020, The Commons submitted an amended general plan which complied with the City's 2018 Floodplain Ordinance and did not require a variance from the amended ordinance. The revised plan reflected a 72% reduction in developable land from the original plan, with less than half the lots originally planned and none of the signature waterfront lots. The City granted The Commons' amended plan.

### E.    The Commons' Second Lawsuit

On November 30, 2020, The Commons filed this lawsuit asserting a takings claim against the City. The Commons alleged that the City's amended floodplain ordinance "intentionally and unreasonably restricted The Commons'[] use and enjoyment of its property," "deprived The Commons of all economically beneficial or productive use of this land and destroyed all value of entitlements secured and improvements made towards the original development plan for [T]he Crossing," and "unreasonably interfered with [T]he Commons'[] investment-backed expectations for its property." The Commons alleged that the City's actions

constituted a taking, damaging, or destruction of its property without adequate compensation in violation of Article I, Section 17 of the Texas Constitution. The City answered asserting a general denial and defenses, including governmental immunity.

On May 5, 2021, the City filed a plea to the jurisdiction, arguing that the Commons' regulatory takings claim remained unripe because the City had not made a final decision on a permit or plan application and The Commons' futility argument was unavailing. Citing *Adolph v. Federal Emergency Management Agency*, 854 F.2d 732 (5th Cir. 1988), the City argued that The Commons' takings claim was also barred by governmental immunity because the 2018 Floodplain Ordinance does not give rise to a takings claim as a matter of law. The City asserted that the trial court therefore lacked subject matter jurisdiction over The Commons' takings claim.

In its response to the City's plea, The Commons argued that in accordance with the Fourteenth Court of Appeals' prior decision, The Commons provided the City with ample opportunity to issue a final decision, the City unreasonably withheld one, and The Commons' claim ripened under the futility doctrine. It further argued that the cases the City cited in support of its contention that a takings claim based on a municipal floodplain ordinance designed to comply with the NFIP fails as a matter of law are inapplicable because they relate only to

11

challenges to the validity of flood control measures—not claims for compensation—and primarily to challenges brought against FEMA.

The City replied that (1) through its admittedly incomplete applications, The Commons' had failed to take the "reasonable and necessary steps" for the City to exercise its discretion, (2) The Commons' claim of futility was not supported by case law, and (3) The Commons' attempt to distinguish the Fifth Circuit's decision in *Adolph* was unavailing.

The trial court held a hearing on the City's plea to the jurisdiction. On July 5, 2021, the trial court entered an order denying the City's plea. This interlocutory appeal followed.[4]

**Discussion**

In two issues, the City contends that the trial court erred in denying its plea to the jurisdiction because (1) The Commons' taking claim is barred by the City's governmental immunity and (2) The Commons' as-applied takings claim is unripe.

**A.    Standard of Review**

Subject matter jurisdiction is essential to a court's power to decide a case. *City of Houston v. Rhule*, 417 S.W.3d 440, 442 (Tex. 2013); *City of DeSoto v. White*, 288 S.W.3d 389, 393 (Tex. 2009). To establish subject matter jurisdiction, a

---

[4]    *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8) (authorizing interlocutory appeal from trial court's order denying governmental unit's challenge to subject matter jurisdiction).

plaintiff must allege facts that affirmatively demonstrate the court's jurisdiction to hear the claim. *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 550 (Tex. 2019). A plea to the jurisdiction is a dilatory plea that seeks dismissal of a case for lack of subject-matter jurisdiction. *Harris Cnty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004); *TitleMax of Tex., Inc. v. City of Austin*, 639 S.W.3d 240, 245 (Tex. App.—Houston [1st Dist.] 2021, no pet.). We review a trial court's ruling on a plea to the jurisdiction de novo. *See Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist. v. Tex. Political Subdivs. Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320, 323 (Tex. 2006); *City of Houston v. Vallejo*, 371 S.W.3d 499, 501 (Tex. App.—Houston [1st Dist.] 2012, pet. denied).

There are two general categories of pleas to the jurisdiction: (1) those that challenge only the pleadings, and (2) those that present evidence to challenge the existence of jurisdictional facts. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226–27 (Tex. 2004). When a plea to the jurisdiction challenges only the pleadings, we determine whether the pleader has alleged facts establishing the court's jurisdiction to hear the case. *Id.* at 226. Our de novo review looks to the pleader's intent and construes the pleadings in its favor. *Id.* If the plaintiff fails to plead facts establishing jurisdiction, but the petition does not show incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiff should be afforded the opportunity to amend. *Id.* at 226–27. On the other hand,

"[i]f the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiff an opportunity to amend." *Id.* at 227.

Review of a plea challenging the existence of jurisdictional facts mirrors the standard of review on a motion for summary judgment. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012); *Miranda*, 133 S.W.3d at 228 ("[T]his standard generally mirrors that of a summary judgment under Texas Rule of Civil Procedure 166a(c). . . . By requiring the [S]tate to meet the summary judgment standard of proof . . . we protect the plaintiff[] from having to put on [its] case simply to establish jurisdiction." (internal quotations and citations omitted)); *see also* TEX. R. CIV. P. 166a(c). "[A] court deciding a plea to the jurisdiction . . . may consider evidence and must do so when necessary to resolve the jurisdictional issues raised." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000). A court may consider evidence necessary to resolve a dispute over jurisdictional facts even if the evidence "implicates both the subject matter jurisdiction of the court and the merits of the case." *Miranda*, 133 S.W.3d at 226. If the defendant meets its burden to establish the trial court lacks jurisdiction, the plaintiff is then required to show there is a question of material fact over the jurisdictional issue. *Id.* at 227–28. If the evidence raises a fact issue concerning jurisdiction, the plea cannot be granted, and the fact finder must resolve the issue.

14

*Id.* On the other hand, if the evidence is undisputed or fails to raise a fact issue, the plea must be determined as a matter of law. *Garcia*, 372 S.W.3d at 635.

## B. Applicable Law

Sovereign immunity and its counterpart for political subdivisions, governmental immunity, protect the State and its political subdivisions, including counties, cities, and municipalities, from lawsuits and liability for money damages. *See Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006). "Sovereign immunity from suit defeats a trial court's subject matter jurisdiction and thus is properly asserted in a plea to the jurisdiction." *Miranda*, 133 S.W.3d at 225–26. "Absent a valid statutory or constitutional waiver, trial courts lack subject-matter jurisdiction to adjudicate lawsuits against municipalities." *Suarez v. City of Texas City*, 465 S.W.3d 623, 631 (Tex. 2015). The trial court must determine at its earliest opportunity whether it has the constitutional or statutory authority to decide the case before allowing the litigation to proceed. *Miranda*, 133 S.W.3d at 226.

The Texas Constitution provides a limited waiver of a governmental unit's immunity from suit when property is taken, damaged, or destroyed for public use without adequate compensation. *See* TEX. CONST. art. I, § 17(a) ("No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made . . . ."); *see also Gen. Servs. Comm'n v. Little–Tex Insulation Co.*, 39 S.W.3d 591, 598 (Tex. 2001); *Gulf Coast Waste Disposal*

*Auth. v. Four Seasons Equip., Inc*., 321 S.W.3d 168, 173 (Tex. App.—Houston [1st Dist.] 2010, no pet.). Similarly, the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. CONST. amend. V. Although the takings clauses of the United States and Texas Constitutions are worded differently, the Texas Supreme Court has stated that our case law on takings is comparable to federal jurisprudence. *See Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 477 (Tex. 2012) ("We consider the federal and state takings claims together, as the analysis for both is complementary."); *Hallco Tex., Inc. v. McMullen Cnty*., 221 S.W.3d 50, 56 (Tex. 2006).

Takings of property are generally classified as physical or regulatory. *See Yee v. City of Escondido, Cal.*, 503 U.S. 519, 522–23 (1992); *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 933 (Tex. 1998). A physical taking occurs when the government authorizes an unwarranted physical occupation of property whereas a regulatory taking occurs when the government enacts a regulation that injures property value or usefulness. *See Yee*, 503 U.S. at 522; *Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 669–70 (Tex. 2004). A viable regulatory takings claim may challenge a land use restriction on its face or as applied to particular property. *See City of Corpus Christi v. Pub. Util. Comm'n of Tex*., 51 S.W.3d 231,

247 (Tex. 2001) (Owen, J., concurring) (describing takings claim as "an as-applied constitutional challenge, rather than a facial challenge").

If the government physically appropriates or invades the property, or unreasonably interferes with the landowner's right to use and enjoy the property, such as by restricting access or denying a permit for development, without paying adequate compensation, the owner may bring an inverse condemnation claim to recover the resulting damages. *Westgate, Ltd. v. State*, 843 S.W.2d 448, 452 (Tex. 1992). To plead a valid inverse condemnation claim and establish waiver of immunity under the takings clause, a plaintiff must allege that the governmental entity (1) intentionally performed certain acts in the exercise of its lawful authority (2) that resulted in taking, damaging, or destroying the plaintiff's property (3) for public use. *Gen. Servs. Comm'n*, 39 S.W.3d at 598; *Flores v. City of Galveston*, No. 01-20-00042-CV, 2022 WL 120018, at *9 (Tex. App.—Houston [1st Dist.] Jan. 13, 2022, no pet.) (mem. op.). A governmental entity does not have immunity from a valid takings claim. *Gen. Servs. Comm'n*, 39 S.W.3d at 598. However, the question of whether particular facts give rise to a "taking" of property is a question of law that we review de novo. *See City of Austin v. Travis Cnty. Landfill Co.*, 73 S.W.3d 234, 241 (Tex. 2002); *Mayhew*, 964 S.W.2d at 937.

17

## C.     Analysis

The City contends that The Commons' takings claim is barred by governmental immunity because, as a matter of law, requiring compliance with local laws consistent with FEMA/NFIP requirements does not constitute a taking. The City further argues that the 2018 Floodplain Ordinance's elevation requirements cannot constitute a taking because *Adolph* demonstrates conclusively that reasonable minds could conclude that such requirements were adopted to accomplish legitimate goals, are substantially related to the public's health, safety, or general welfare, and are reasonable. The City asserts that, in the alternative, The Commons has conceded that it has not suffered a total destruction of its property and, thus, it has not suffered a valid *Lucas*[5] claim. In response, The Commons contends that it properly pleaded an inverse condemnation claim and therefore governmental immunity does not bar its claim. It argues that a valid exercise of police power can still constitute a taking and that no justification exists for exempting floodplain regulations from constitutional limitations on governmental powers. It further argues that the Fifth Circuit's holding in *Adolph* in inapplicable here because it applies only to ordinances that "track the criteria of the NFIP," not to more restrictive ordinances such as the one at issue in this case. It asserts that

---

[5]     A "Lucas" taking occurs when a governmental regulation completely deprives an owner of "*all* economically beneficial us[e]" of [] property." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005) (citing *Lucas v. So. Carolina Costal Council*, 505 U.S. 1003, 1014 (1992) (emphasis in original)).

*Adolph* applies only to facial challenges, not as-applied claims, and The Commons has alleged only an as-applied takings clam.

## 1. *Adolph v. Federal Emergency Management Agency*, 854 F.2d 732 (5th Cir. 1988)

The City relies on the Fifth Circuit's holding in *Adolph* in support of its argument that neither compliance with FEMA/NFIP requirements nor local companion regulations can result in a taking as matter of law. In *Adolph*, Louisiana property owners filed a class action challenging the local parish commission council's enactment, without compensation, of building ordinances as flood control measures. *See* 854 F.2d at 733. Because the parish was required by FEMA regulations to adopt the stringent building code to participate in the NFIP, the plaintiffs named FEMA as a defendant, as well as the parish council, whose body had imposed the challenged building ordinances, which conformed to federal standards, upon the residents. *See id.* The plaintiffs alleged that imposition of the severe flood control regulations amounted to an unconstitutional taking. *See id.*

The district court dismissed the complaint for failure to state a claim. *See id.* Its disposition was based on two holdings: (1) that the ordinances were passed by the parish (which was named as a party and against which the litigation was stayed pending the Court's decision), rather than FEMA, and thus there was no Article III case or controversy; and (2) that the FEMA regulations did not result in an unconstitutional taking. *See id.* at 734. On appeal, the plaintiffs argued that an

actual controversy existed between plaintiffs and FEMA because the parish ordinances were passed pursuant to FEMA regulations. *See id.* It also argued that whether an unconstitutional taking has occurred depends upon the reasonableness of the government regulation and that reasonableness should be determined on the facts as a whole on a case-by-case basis, rather than on a motion to dismiss. *See id.*

The Fifth Circuit affirmed the lower court's dismissal of the plaintiffs' takings claim against FEMA. *See id.* at 740. It concluded that the plaintiffs' takings argument was legally unsupportable. *See id.* at 735. Noting that it had not previously addressed the precise issue of flood control measures that eliminate commercial value, the Court stated, "we adopt *Texas Landowners* [*Rights Ass'n v. Harris*'s] conclusion that the NFIP, when operating precisely as intended by Congress, results in no unconstitutional taking of plaintiffs' property, regardless of state law." *Id*. at 737.[6]

The City contends that, as in *Adolph*, Houston's 2018 Floodplain Ordinance states on its face that it was designed to be consistent with FEMA/NFIP criteria to allow Houston residents to obtain flood insurance, and to protect the public health, safety, and welfare from the dangers of flooding. The Commons responds that the

---

[6]     In *Texas Landowners Rights Association v. Harris*, the federal district court held that FEMA's flood prevention regulatory guidelines for local ordinances did not result in an unconstitutional taking. 453 F. Supp. 1025, 1032–33 (D.D.C. 1978), *aff'd*, 598 F.2d 311 (D.C. Cir. 1979).

City's reliance on *Adolph* is misplaced because *Adolph*'s holding is limited to local regulations that track the NFIP requirements whereas the City's amendments to the ordinance were not necessary for its participation in FEMA. In support of its assertion, The Commons points to evidence showing that while FEMA only requires participants to regulate the 100-year floodplain, Chapter 19's amendments expanded floodplain regulations to the 500-year floodplain. It also points out that FEMA only mandates that participants require minimum floor elevation at or above the base flood elevation, but that the City was already exceeding this requirement when it enacted the amendments.

While it is true that the *Adolph* court held that local land use regulations that track NFIP criteria do not constitute a taking, we find nothing in the opinion's language limiting its holding to regulations that are identical to NFIP/FEMA criteria, and The Commons does not direct us to any authority in support of such a limitation. We further note that the court in *Adolph* recognized that courts have almost uniformly rejected takings claims based on building restrictions brought against state flood management authorities, and that the same rejection of the takings claim obtains when the local government is sued. *See id.* at 738. In particular, the court noted, "[f]or instance, a local ordinance (more restrictive than the NFIP) adopted for purposes of participation in the NFIP was, after careful scrutiny by the Supreme Court of North Carolina, found not to be an

21

unconstitutional taking of property." *Id.* (citing *Responsible Citizens v. City of Asheville*, 302 S.E.2d 204 (N.C. 1983)). The *Adolph* court's reference to a case involving a local ordinance adopted for purposes of NFIP participation that was even more restrictive than the NFIP suggests that its holding is not limited to regulations that track NFIP criteria.[7] *See also Guadalupe Cnty. v. Woodlake Partners, Inc.*, No. 04-16-00253-CV, 2017 WL 1337650, at \*3 (Tex. App.—San Antonio Apr. 12, 2017, pet. denied) (mem. op.) (citing *Adolph* for its recognition of almost uniform rejection of takings claims where state flood-management authorities are sued on allegations that their building restrictions, which were adopted for purposes of participating in NFIP, constituted takings).

And, as the City notes, the 2018 Floodplain Ordinance states that it was adopted, after consultation and public comment,[8] to comply with NFIP/FEMA standards and in anticipation of new FEMA floodplain maps generated in response

---

[7]     As another example, the *Adolph* court also cited the Washington Supreme Court's decision in *Maple Leaf Inv., Inc. v. State Dept. of Ecology*, 565 P.2d 1162 (Wash. 1977), upholding an ordinance that prohibited all residential development—not only that which would increase flood levels. *See Adolph v. Fed. Emergency Mgmt. Agency*, 854 F.2d 732, 738 (5th Cir. 1988).

[8]     "Houston Public Works has reviewed Chapter 19, Floodplains and implementing guidelines, has received technical assistance and input from professional stakeholder groups, has provided opportunity for public comment on these revisions, with over 3000 comments received, and after review and consideration, recommends the changes contained in this Ordinance . . . ." Ord. No. 2018-258.

to Hurricane Harvey.[9] Ord. No. 2018-258. The Ordinance's preamble states, in part:

> [T]he City desires to continue its participation in the Federal Insurance Rate Map (FIRM) program and to continue to meet the requirements of Title 44 Code of Federal Regulations, Sections 59 and 60 to allow its residents and businesses to secure insurance protection against flooding events at the most reasonable rates available . . . .
>
> [T]he City Council finds that, to promote the public health, safety and general welfare of the City, and to meet federal requirements contained in 44 CFR Part 60, it is desirable to adopt this Ordinance to: (1) [f]ulfill the City's obligation to regulate development in special flood hazard areas to ensure continued participation in FIRM . . . .

We further note that FEMA regulations mandate "adequate" flood management regulations, not identical ones, and expressly encourage stricter local regulations, noting that they will supplant and supersede the minimum regulations set forth by FEMA:

> The criteria set forth in this subpart are minimum standards for the adoption of flood plain management regulations by flood-prone, mudslide (i.e., mudflow)-prone and flood-related erosion-prone communities. Any community may exceed the minimum criteria under this part by adopting more comprehensive flood plain management regulations . . . . In some instances, community officials may have access to information or knowledge of conditions that require, particularly for human safety, higher standards than the minimum criteria set forth in subpart A of this part. Therefore, any flood plain management regulations adopted by a State or a

---

[9] "[T]he City anticipates that FEMA will evaluate flood areas and issue new maps for the Houston area . . . ." *Id.*

23

community which are more restrictive than the criteria set forth in this part are encouraged and shall take precedence.

44 C.F.R. § 60.1(d).

The Commons contends that even if *Adolph*'s holding applied to local regulations that exceed NFIP requirements, it does not apply here because its holding is limited to facial challenges and The Commons has pleaded only an as-applied takings claim. In support of its argument, The Commons points to the following language:

> Language in the local land-use regulations that tracks the criteria of the NFIP does not, on its face, effect a taking in violation of the fifth and fourteenth amendments. The parish's building code protects the public health and substantial non-complying, but non-injurious uses are permitted; there are also no indications of arbitrary, discriminatory, or acquisitive governmental conduct. The validity under state law of the actual application of this ordinance to a particular piece of property depends upon the facts involved in each case, but FEMA would not be a proper party, because the parish's enactment in compliance with FEMA standards and in order to participate in the NFIP was neither under federal coercion nor as an unconstitutional condition to federal benefits. The district court's correct decision with respect to FEMA was one of law and required no factual development.

*Adolph*, 854 F.2d at 740.

We find The Commons' contention unavailing. Although *Adolph* addressed a facial challenge, the court also noted that "[t]he plaintiffs' chance of prevailing on the merits here is not increased by having joined the parish as a party-defendant, because even when the local government is sued directly, the same rejection of the takings claim obtains." *Id.* at 738. This language does not limit the court's holding

24

only to facial challenges—rather, it indicates only that where a local regulation states on its face that it tracks NFIP criteria, courts do not need to look any further to find that the regulation does not amount to a taking.[10]

## 2. City's Exercise of Police Power

The City argues that even if this Court concludes that, under *Adolph*, The Commons' takings claim is not barred as a matter of law, The Commons was still required to plead facts showing that the 2018 Floodplain Ordinance was a taking, which it failed to do. Citing *Adolph* and the Texas Supreme Court's decision in *City of College Station v. Turtle Rock Corp.*, 680 S.W.2d 802 (Tex. 1984), the City asserts that the 2018 Floodplain Ordinance's elevation requirements cannot constitute a taking as a matter of law because reasonable minds could conclude that the City's 2018 Floodplain Ordinance was adopted to accomplish a legitimate goal, and is substantially related to health, safety, or general welfare of the people and is reasonable.

---

[10] The *Adolph* court cites *Responsible Citizens v. City of Asheville*, 302 S.E.2d 204 (N.C. 1983), in which the North Carolina Supreme Court concluded that a land use ordinance enacted by the city which set forth land use regulations on properties located in a flood hazard district and required that new construction and substantial improvements on property be built so as to prevent or minimize flood damage, did not constitute a taking of the plaintiffs' properties in violation of the state constitution. *See id.* at 211. In a footnote, the court noted "[a]lthough it is not clear whether plaintiffs are attacking the validity of this land-use ordinance as being unconstitutional on its face or as applied to plaintiffs, we will deal with the issue as being the constitutionality of the ordinance as applied to plaintiffs." *Id.* at 209 n.3.

"A city may enact reasonable regulations to promote the health, safety, and general welfare of its people." *Turtle Rock Corp.*, 680 S.W.2d at 805; *Lombardo v. City of Dall.*, 73 S.W.2d 475, 478 (Tex. 1934). "[I]n order for [an] ordinance to be a valid exercise of the city's police power, not constituting a taking, there are two related requirements." *Turtle Rock Corp.*, 680 S.W.2d at 805. "First, the regulation must be adopted to accomplish a legitimate goal; it must be 'substantially related' to the health, safety, or general welfare of the people." *Id.*; *Lombardo*, 73 S.W.2d at 479. "Second, the regulation must be reasonable; it cannot be arbitrary." *Turtle Rock Corp.*, 680 S.W.2d at 805; *City of Univ. Park v. Benners*, 485 S.W.2d 773, 778 (Tex. 1972), *abrogated on other grounds by Bd. of Adjustment of City of San Antonio v. Wende*, 92 S.W.3d 424 (Tex. 2002). "In other words, it must 'substantially' advance the legitimate goals of the city." *Lamar Corp. v. City of Longview*, 270 S.W.3d 609, 615 (Tex. App.—Texarkana 2008, no pet.) (citing *Mayhew*, 964 S.W.2d at 933–34 (Tex. 1998)). A city is not required to make compensation for losses occasioned by the proper and reasonable exercise of its police power. *Turtle Rock Corp.*, 680 S.W.2d at 804 (citing *Lombardo*, 73 S.W.2d at 479). "If reasonable minds may differ as to whether or not a particular zoning ordinance has a substantial relationship to the public health, safety, morals, or general welfare . . . the ordinance must stand as a valid exercise of the city's police power." *Id.* (quoting *Hunt v. City of San Antonio*, 462 S.W.2d 536, 539 (Tex.

26

1971)); *City of Pharr v. Tippitt*, 616 S.W.2d 173, 176 (Tex. 1981); *Thompson v. City of Palestine*, 510 S.W.2d 579, 581 (Tex. 1974); *see also Eller Media Co. v. City of Hous.*, 101 S.W.3d 668, 682 (Tex. App.—Houston [1st Dist.] 2003, pet, denied). "The presumption favors the reasonableness and validity of the ordinance," and "[a]n 'extraordinary burden' rests on one attacking a city ordinance." *Turtle Rock Corp.*, 680 S.W.2d at 805 (quoting *Hunt*, 462 S.W.2d at 539).

The Commons argues that *Turtle Rock*'s holding is limited to facial challenges and therefore does not apply to its as-applied challenge. While *Turtle Rock* addressed a developer's facial constitutional challenge to the city's ordinance requiring a parkland dedication, or money in lieu thereof, as a condition to subdivision plat approval, as with *Adolph*, we find nothing in the court's decision suggesting that it is limited to facial challenges. And, we note that other courts have cited *Turtle Rock* in cases involving as-applied challenges. *See, e.g., Lamar Corp.*, 270 S.W.3d at 617 (affirming district court's finding that city ordinance did not constitute taking of plaintiff's private property without just compensation); *Meek v. Smith*, 7 S.W.3d 297, 302–03 (Tex. App.—Beaumont 1999, no pet.) (concluding statute giving right of access across land surrounding cemetery without public ingress or egress to those persons who desired to visit cemetery

constituted unconstitutional taking of property without just compensation as applied to property owners near cemetery).

The Commons also argues that the 2018 Floodplain Ordinance is not an exercise of the City's police power. It asserts that although the City characterizes its amended ordinance as an exercise of its police power, the amended ordinance does nothing to protect residents from flooding, and residents retained access to federal flood insurance under the prior ordinance. The Commons, however, provides no supporting authority or explanation in support of its contention.

The stated purpose of the 2018 Floodplain Ordinance "is to promote the public health, safety and general welfare and to minimize public and private losses due to flood conditions in specific areas . . . ." Code of Ordinances ch. 19, art. I, § 19-1(a). Chapter 19 "provides a regulatory system to monitor the review of plats and permits to reduce the likelihood that development within this city will increase the dangers of flooding." *Id*. § 19-1(b). Ordinance No. 2018-258, which enacted the amended ordinance, states "the City Council finds that, to promote the public health, safety and general welfare of the City, and to meet federal requirements contained in 44 CFR Part 60, it is desirable to adopt this Ordinance to . . . [r]educe flood losses and the loss of human life." Ord. No. 2018-258. The amended ordinance is substantially related to the public health, safety, and general welfare of the City's citizens. *See Turtle Rock Corp.*, 680 S.W.2d at 805.

Chapter 19 is intended to provide "[t]he degree of regulation for flood protection . . . reasonable for regulatory purposes . . . based on maps promulgated by FEMA that are required to be used as a condition of obtaining flood insurance." Code of Ordinances ch. 19, art. I, § 19-1(c). The City Council specifically found that "it is reasonable to expect that the new special flood hazard areas will include at least all the areas currently designated as the 100-year and 500-year flood zones on current FEMA maps," and that "the regulations proposed by Houston Public Works to require elevation of structures to two-feet above the 500-year elevation [are] therefore reasonable, will reduce flood losses, and reduce the danger to human life." Ord. No. 2018-258. The amended ordinance accomplishes the legitimate goals of the City and is reasonable and not arbitrary. *See Turtle Rock Corp.*, 680 S.W.2d at 805.

The City's amended ordinance is "presumed to be a valid exercise of the police power absent a contrary showing by the plaintiff on the basis of which reasonable minds could not differ." *Hallco Tex., Inc. v. McMullen Cnty.*, No. 04-96-00681-CV, 1997 WL 184719, at *2 (Tex. App.—San Antonio Apr. 16, 1997, no writ). The Commons has not made such a showing. Because reasonable minds could conclude that the amended ordinance's elevation requirements are substantially related to the health, safety, or general welfare of the citizens and are reasonable, the 2018 Floodplain Ordinance "must stand as a valid exercise of the

29

city's police power" and does not constitute a taking. *Turtle Rock Corp.*, 680 S.W.2d at 805.

Because the Commons' regulatory takings claim is barred by governmental immunity, the trial court erred in denying the City's plea to the jurisdiction. Accordingly, we sustain the City's first issue.[11]

### Conclusion

We reverse the trial court's order denying the City's plea to the jurisdiction and render judgment dismissing The Commons' claims for want of subject matter jurisdiction.

Amparo Guerra
Justice

Panel consists of Justices Kelly, Rivas-Molloy, and Guerra.

---

[11] In light of our disposition, we do not reach the City's second issue asserting that The Commons' takings claim is not ripe for adjudication.

30